**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Lewis T. Babcock, Senior Judge

Civil Action No. 15-cv-00262-LTB

**FREDERICK D. MOORE**,

Plaintiff,

v.

**STEVE HARTLEY**, Warden, Cheyenne Mountain Re-Entry Center;
**PATSY PAULK**, Deputy Director of Programs, Cheyenne Mountain Re-Entry Center;
**SAHIB BROWN**, Chief of Programs, Cheyenne Mountain Re-Entry Center;
**KELLY LEHMAN**, Unit Manager, Cheyenne Mountain Re-Entry Center; and
**MARIA JUAREZ**, Unit Manager, Cheyenne Mountain Re-Entry Center,

Defendants.

---

## ORDER TO DISMISS

---

Plaintiff, Frederick D. Moore, is an inmate currently incarcerated at the Skyline Correctional Center (SCC) located in Canon City, Colorado. Acting *pro se*, he initiated this action by filing a Prisoner Complaint pursuant to 42 U.S.C. § 1983 challenging the conditions of his confinement while he was incarcerated at the Cheyenne Mountain Re-Entry Center (CMRC), a private correctional facility operated by Community Education Centers, Inc.

### A. Applicable Legal Principles

In the Prison Litigation Reform Act (PLRA), Pub.L. No. 104–134, 110 Stat. 1321 (1996), Congress adopted major changes affecting federal actions brought by prisoners in an effort to curb the increasing number of frivolous and harassing law suits brought by persons in custody. Pertinent to the case at bar is the authority granted to federal courts for *sua sponte* screening and dismissal of prisoner claims.

Specifically, Congress significantly amended Title 28 of the United States Code, section 1915, which establishes the criteria for allowing an action to proceed *in forma pauperis* (IFP), *i.e.*, without prepayment of costs. Section 1915(e) (as amended) requires the federal courts to review complaints filed by persons that are proceeding *in forma pauperis* and to dismiss, at any time, any action that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

In addition, Congress enacted a new statutory provision at 28 U.S.C. § 1915A, entitled "Screening," which requires the court to review complaints filed by prisoners seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). If the complaint is "frivolous, malicious, or fails to state a claim upon which relief can be granted," or "seeks monetary relief from a defendant who is immune from such relief," the court must dismiss the complaint. 28 U.S.C. § 1915A(b).

Further, the PLRA substantially amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997e. In this regard, the PLRA amended section 1997e(c) to require the court "on its own motion or on the motion of a party" to dismiss any action brought by a prisoner with respect to prison conditions under 42 U.S.C. § 1983 if the action is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." *See* 42 U.S.C. § 1997e(c)(1).[1]

Plaintiff is considered a "prisoner" as that term is defined under the PLRA, *see* 28 U.S.C. §§ 1915(h); 1915A(c), and he has been granted leave to proceed IFP in this action (ECF No. 10).

---

[1] When reviewing a complaint for failure to state a claim, the Court may also consider documents attached to the complaint as exhibits. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) ("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.")).

Thus his allegations must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B). Moreover, his Complaint concerns prison conditions. Thus, his Complaint must be reviewed under the authority set forth above.

In reviewing complaints under these statutory provisions, a viable complaint must include “enough facts to state a claim to relief that is plausible on its face.” *Bell Atlantic Corp. v.Twombly*, 550 U.S. 554, 556 (2007) (rejecting the traditional standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). The question to be resolved is: whether, taking the factual allegations of the complaint, which are not contradicted by the exhibits and matters of which judicial notice may be had, and taking all reasonable inferences to be drawn from those uncontradicted factual allegations of the complaint, are the "factual allegations ... enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true even if doubtful in fact[.]" *Bell Atlantic Corp.*, 550 U.S. at 555. Moreover, a legally frivolous claim is one in which the plaintiff asserts the violation of a legal interest that clearly does not exist or asserts facts that do not support an arguable claim. *Neitzke v. Williams*, 490 U.S. 319, 324 (1989). *See Conkleton v. Raemisch*, Civil No. No. 14–1271, ___ Fed. App’x ___, 2015 WL 794901 (10th Cir. Feb. 26, 2015) (upholding in part District Court’s dismissal as frivolous of prisoner civil rights complaint); *Ross v. Romero*, 191 Fed. App’x 682 (10th Cir. 2006) (affirming district court’s *sua sponte* dismissal of prisoner’s civil rights complaint under 28 U.S.C. § 1915(b).

The Court must construe the Complaint liberally because Plaintiff is a *pro se* litigant. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). If a complaint reasonably can be read “to state a valid claim on which the plaintiff could prevail, [a court] should do so despite the plaintiff’s failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity

with pleading requirements." *Hall*, 935 F.2d at 1110. However, a court should not act as a *pro se* litigant's advocate. *See id.* *Sua sponte* dismissal is proper when it is patently obvious that plaintiff could not prevail on the facts alleged and allowing him an opportunity to amend his complaint would be futile. *Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001) (internal quotations omitted).

**B. Plaintiff's Factual Allegations**

On July 24, 2014, Mr. Moore was transferred to Cheyenne Mountain Re-Entry Center (CMRC) intake for housing. On July 25, 2014, he was presented with the "Positive Peer Community Resident Handbook" (Handbook) (ECF No. 1, pp. 8-37). In the morning, inmates were required to stand and recite the CMRC Credo, Attitude, and Choices. Refusing to participate would result in a misconduct for disobeying a lawful order.

During the day, inmates attending phased programming classes where they studied the Handbook. After successful completion of each program, inmates could progress through several phases, each of which would allow them extra privileges. Successful completion was based on adherence to the CMRC principal and beliefs as set forth in the Handbook.

Plaintiff asserts that adherence to the Handbook's rules and regulations has violated his rights as protected by the First, Eighth and Fourteenth Amendments of the United States, as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA). For the reasons stated below, the Complaint and the action will be dismissed pursuant to screening authority set forth above. The pertinent grounds which will result in the dismissal of all claims against all Defendants are addressed below.

**C. Exhaustion of Administrative Remedies**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The "PLRA's exhaustion requirement applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). *See also Booth v. Churner*, 532 U.S. 731, 731–32 (2001) (PLRA requires exhaustion in all matters regardless of remedy sought and availability of remedy at the agency level).

The PLRA's requirement that an inmate exhaust all available administrative remedies before initiating suit is mandatory. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). *See also Jones v. Bock*, 549 U.S. 199, 210–212 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id*. at 204. A prisoner must exhaust his administrative remedies by complying with applicable prison grievance procedures *before* filing a suit related to prison conditions. Not only must the prisoner exhaust all available remedies, but such exhaustion must be proper, including compliance with an agency's deadlines and other critical procedural rules. *Woodford v. Ngo,* 548 U.S. at 90. Because § 1997e(a) expressly requires exhaustion, prisoners may not deliberately bypass the administrative process by flouting an agency's procedural rules. A court can dismiss a case prior to service on defendants for failure to state a claim, predicated on failure to exhaust, if the complaint itself makes clear that the prisoner failed to exhaust. *See Jones*, 549 U.S. at 215 (holding that courts can dismiss for failure to state a claim when the existence of an affirmative defense, like a statute of limitations bar, is apparent from the face of the complaint).

"To exhaust administrative remedies an inmate must properly comply with grievance

procedures; substantial compliance is insufficient." *Fields v. Oklahoma State Penitentiary*, 511 F.3d 1109, 1112 (10th Cir. 2007). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules,—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (internal quotation marks and citation omitted). Thus, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*.

Under the PLRA, Mr. Moore was required to exhaust completely his available administrative remedies prior to bringing his claims in federal court. Colorado Department of Correction (CDOC) regulations provide for a three-step administrative grievance process. Following an attempt at informal resolution, an inmate may file a Step 1 grievance, which shall be investigated and answered by the involved DOC employee, contract worker, or volunteer, together with a DOC employee appointed by the administrative head, or designee. Admin. Reg. No. 850–04(IV)(C)(1)(a). A Step 1 grievance must be filed within thirty (30) calendar days from the date the offender knew, or should have known, of the facts giving rise to the complaint. Admin. Reg. No. 850–04(IV)(F)(1)(a). The offender shall receive a written response within twenty-five (25) calendar days of its receipt by the case manager/CPO. Admin. Reg. No. 850–04(IV)(F)(1)(b). If an inmate is dissatisfied with the response, he may file a Step 2 grievances within five calendar days of receiving the written response. Admin. Reg. No. 850–04(IV)(F)(1)(d). Step 2 grievances are investigated and answered by the administrative head, or his designee, Admin. Reg. No. 850–04(IV)(C)(1)(b), and must be answered within twenty-five (25) days. Admin. Reg. No. 850–04(IV)(F)(1)(b). If an inmate is dissatisfied with the Step 2 response, he may file a Step 3 grievance within five calendar days of receiving the written response. Admin. Reg. No. 850–04(IV)(F)(1)(d). Step 3 grievances are investigated and answered by CDOC's grievance officer, Admin. Reg. No. 850–04(IV)(C)(1)(c), and must be

answered within forty-five (45) days of receipt by the grievance officer. Admin. Reg. No. 850–04(IV)(F)(1)(c). An inmate who has properly pursued all three grievances has exhausted his administrative remedies through the CDOC and may proceed in federal court. *See Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008); *Whitington v. Ortiz,* 472 F.3d 804, 807 (10th Cir. 2007).

"Since the PLRA makes exhaustion a precondition to filing a suit, an action brought before administrative remedies are exhausted must be dismissed...." *Ruppert v. Aragon*, 448 F. App'x 862, 863 (10th Cir. 2012); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (an "inmate who begins the grievance process but does not complete it is barred from pursuing a ... claim under the PLRA for failure to exhaust his administrative remedies.").

By his own admissions, Mr. Moore alleges that he failed to properly exhaust his administrative remedies before filing his claims. In this regard, Mr. Moore attached his Step 1 and Step 2 Grievances to his Complaint as Exhibits (ECF No. 1, pp 22-23). He received a response to his Step 2 Grievance on January 9, 2015 and filed a Step 3 Grievance on January 12, 2015. As he specifically indicates in his Complaint, the deadline for responding to his Step 3 was February 27, 2015.

Plaintiff filed this action on February 6, 2015, before he had completely exhausted his administrative remedies. Plaintiff acknowledges this fact on the face of the complaint. At the time he filed his complaint on February 6, 2015, the Third Step Response had not been issued. Because it is apparent on the face of the complaint that Mr. Moore failed to exhaust his available administrative remedies regarding the claims raised in the complaint prior to filing suit, as required by 42 U.S.C. § 1997e(a), this action must be dismissed. *Accord Carbe v. Lappin*, 492 F.3d 325, 328 (5th Cir. 2007) (where complaint made clear that prisoner failed to exhaust administrative remedies, district court may dismiss it sua sponte for failure to state a claim); *Fletcher v. Myers*, No. 5:11–141

(E.D. Ky. May 17, 2012), *aff'd*, No. 12–5630 (6th Cir. Jan. 4, 2013) ("Because Fletcher's failure to exhaust, or to attempt to exhaust, administrative remedies is apparent from the face of his complaint, the district court properly dismissed Fletcher's complaint on that basis."); *Smith v. Lief*, No. 10–08, 2010 WL 411134, at *4 (E.D. Ky. Jan. 27, 2010); *Gunn v. Ky. Dept. of Corrections*, No. 5:07–P103, 2008 WL 2002259, at *4 (W.D. Ky. May 7, 2008); *Deruyscher v. Michigan Dept. of Corrections Health*, No. 06–15260, 2007 WL 1452929, at *3 (E.D. Mich. May 17, 2007).

Moreover, as the discussion below reveals, Plaintiff fails to state any plausible basis for relief as to the claims he has raised in his Complaint.

**D. Liability under 42 U.S.C. § 1983**

In this regard, Plaintiff first seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330–331 (1986). In addressing a claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 393–394 (1989) (internal quotations and citations omitted). The validity of the claim then must be judged by reference to the specific constitutional standard which governs that right. *Id*.

1. <u>First Amendment</u>

Plaintiff first claims that the CMRC Program violates his rights under the First Amendment. "The Religion Clauses of the First Amendment provide: 'Congress shall make no law respecting

an establishment of religion, or prohibiting the free exercise thereof.' The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion favoring neither one religion over others nor religious adherents collectively over nonadherents." *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 697 (1994) (internal quotations and citations omitted).

The Establishment Clause is generally the basis upon which to challenge statutes, legislation, or other government action perceived to be religious in nature. With respect to analyses under the Establishment Clause, the United States Supreme Court has said:

> Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . finally, the statute must not foster an excessive government entanglement with religion.

*Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citations and quotation marks omitted).

"The government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that 'religion or a particular religious belief is favored or preferred.'" *Bauchman for Bauchman v. West High School*, 132 F.3d 542, 551 (10th Cir. 1997) (citing *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 592-93 (1989)).

Here, Plaintiff has not plausibly alleged that Defendants have endorsed or disapproved of any religion. In this regard, Plaintiff specifically objects to the Credo, Attitude and Choices sections of the Handbook, which provide as follows.

CMRC CREDO

"We are here seeking an alternative to incarceration. While we are here, we will take direction and instruction from staff on good faith, so that we can learn the errors of our past. We will strive to understand how our old behaviors, attitudes and decision making caused ourselves and others sorrow and pain. We will work to grow intellectually, spiritually, and emotionally. Clearly, our release is inevitable, but our continued freedom is up to us. In order to become the sons, brothers, spouses, and fathers our families deserve, we must acquire information, and use that information to develop a positive lifestyle."

ATTITUDE

Attitude is more important than fact. It is more important than the past, than education, than money, than circumstances, than failures, than success, than what other people think, say, or do. It is more important than appearance, giftedness, or skill. It can make or break a business, a home, a friendship, an organization. The remarkable thing is we have a choice everyday on what our attitude will be. We cannot change our past. We cannot change the actions of others. We cannot change the inevitable. The only thing we can change is our attitude. Life is 10% of what happens to us and 90% of how we react to it.

CHOICES

I choose to live by choice, not by chance.
I choose to make changes, not excuses.
I choose to be useful, not used.
I choose self-esteem, not self-pity.
I choose to excel, not compete.

ECF No. 1, p. 10.

It is clear from the above that there is no basis for a conclusion that these provisions of the Handbook are to advance religion. On the contrary, the Mission Statement clearly states that it is intended "To foster a healthy, drug free, safe, and secure environment wherein we provide treatment and educational services that focuses on changing addictive and criminal behaviors. We provide participants with the knowledge and skills necessary to lead productive lifestyles prior to

reintegration into their new communities." ECF No. 1, p. 10. Thus, the policy clearly has a secular purpose. Moreover, its principal or primary effect is one that neither advances nor inhibits religion. Its primary effect is to reintegrate prisoners into society. Finally, the Handbook does not foster an excessive government entanglement with religion. Consequently, his allegations do not provide any basis for violation of the Establishment Clause.

The Free Exercise Clause "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter*, 544 U.S. at 719. It is well-settled that "[i]nmates ... retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Yet such protections are not without reasonable limitations. The Supreme Court has cautioned that prison inmates are also subject to the "necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id*. Accordingly, the Court has held that "a prison regulation imping[ing] on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Id*. at 349.

As an intial matter, Plaintiff has failed to allege how reciting the credo and following the Attitude and Choices set forth above has substantially burdened his sincerely held religious beliefs. There is no mention of God, prayer or anything of the like within the Handbook. Moreover, it is beyond evident that the lessons embodied within the Credo, Attitude and Choices are secular in nature and designed to help inmates successfully reintegrate within society. No only is this a legitimate penological interest, it is a legitimate societal interest as well. Accordingly, Plaintiff's allegations fail to set forth a violation of his Free Exercise rights as protected by the First Amendment.

In light of the discussion set forth above, this Court finds that Plaintiff cannot plausibly

allege that the program is impermissibly religious in nature or otherwise substantially burdens his religious beliefs or practice. This, his First Amendment claim will be dismissed.

2. Eighth Amendment

Plaintiff's second claim asserts that the CMRC Program violates his rights as protected by the Eighth Amendment because it reqries him to snitch on other inmates in order to successfully progress through the levels to attain greater privileges. Not only is this factually incorrect, it fails to state a claim for relief.

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). In addition, the Cruel and Unusual Punishments Clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers. *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986).

Every Eighth Amendment claim embodies both an objective and a subjective component. The objective component requires that the alleged deprivation be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). What constitutes cruel and unusual punishment under the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Constitution "does not mandate comfortable prisons." *Id*. at 349. To the contrary, jail conditions may be restrictive and even harsh without violating constitutional rights. *Id*. at 347. Indeed, "only those deprivations

denying the minimal civilized measure of life's necessities ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298; *accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A sufficiently serious prison condition is one which exposes an inmate to "a substantial risk of serious harm." *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004). Prison conditions may be harsh and restrictive without violating constitutional rights, *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998), and the relevant inquiry involves a review of the "circumstances, nature, and duration" of the conditions with "the length of exposure to the conditions ... of prime importance." *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001).

The subjective component requires inquiry into the defendant's state of mind to determine whether the infliction of pain was "unnecessary and wanton." *Id*. at 6-7. In the context of prison-conditions claims, the required state of mind is one of "deliberate indifference" to inmate health and safety." *Farmer*, 511 U.S. at 834. "[D]eliberate indifference entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Id*. at 835. In other words, the jailer is liable only if he or she "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "It is not enough to establish that the official should have known of the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998). It is essentially a question of whether the defendant was reckless by "disregard[ing] a risk of harm of which he [was] aware." *Id*. at 836–37.

Plaintiff's allegations are construed as attempting to state a claim of failure to protect. Clearly, a prisoner is entitled to reasonable protection against assault by another inmate. *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489 (10th Cir. 1990). However, Plaintiff has failed to allege

sufficient facts to support such a claim. A claim of failure to protect is evaluated under the Eighth Amendment, which, as stated above, has "both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component of the test is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual Punishment Clause. To satisfy this component, the inmate must show that she was incarcerated under conditions posing a substantial risk of serious harm. The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.' " *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). Under this component, the inmate must establish that prison officials had a sufficiently culpable state of mind in allowing the deprivation to take place. *Verdicia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001)). To be liable for unsafe conditions of confinement the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he (or she) must also draw the inference." *Farmer,* 511 U.S. at 837; *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005). Both components must be satisfied. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).

Here, Plaintiff's allegations are belied by the specific requirements for moving through the phases, which are outlined in the Handbook. No where is there any requirement that inmates must "snitch" on each other in order to advance through the program. Rather, residents are rewarded for consistently demonstrating progress toward program expectations and successfully demonstrating "Role Model" behavior as a member of the community. ECF No. 1, p. 22. Plaintiff alleges that inmates are required to place "pull-ups" on each other and in doing so, put their health at risk for being a snitch. In this regard, the Program contains certain interventions that are intended to help community members avoid continuing with behaviors and attitudes that can lead to ongoing

problems and create destructive dynamics to themselves and the community as whole. ECF No. 1, at p. 20. "Interventions are intended to teach and reinforce values of 'Right Living' that will support a global lifestyle change and prepare community members for pro-social living in the free world." These may be provided by peers as verbal or written pull-ups, which are corrective reminders to the individual. This promotes collectively accountability for the conduct of the community. *Id*.

A verbal pull-up is a friendly verbal reminder or awareness that inappropriate conduct is being displayed. *Id*. Written pull-ups are used after peers or residents have attempted to address issues with other less intensive interventions. *Id*.

Simply stated, this is not the type of unsafe condition of confinement for which Defendants can be held liable. Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "Mere negligence does not constitute deliberate indifference." *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006); *see also Board of County Commissioners v. Brown*, 520 U.S. 397, 407–10 (1997) (A higher standard is required than simple negligence or heightened negligence). Thus, negligent failure to protect inmates from assaults by other inmates is not actionable under the Eighth Amendment. *Farmer*, 511 U.S. at 835. An official's failure to alleviate a significant or obvious risk that he should have perceived but did not, "while no cause for commendation," does not constitute a violation of the Eighth Amendment. *Id*. at 838. Consequently, Plaintiff's Eighth Amendment claim will be dismissed as well.

3. Fourteenth Amendment

Plaintiff also claims that Defendants violated his rights as protected by the Fourteenth Amendment, which prohibits the state from depriving an individual of a constitutionally protected

interest without due process of law. The Due Process Clause was promulgated to secure the individual from the arbitrary exercise of the powers of government. The "procedural" aspect of the Due Process Clause requires the government to follow appropriate procedures to promote fairness in governmental decisions; the "substantive" aspect of the Clause bars certain government actions regardless of the fairness of the procedures used to implement them so as to prevent governmental power from being used for purposes of oppression. *Daniels v. Williams*, 474 U.S. 327, 329-33 (1986) (citations omitted.)

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. *Meachum v. Fano*, 427 U.S. 215, 224 (1976). The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests." *Hewitt v. Helms*, 459 U.S. 460 (1983); *Morrissey v. Brewer*, 408 U.S. 471 (1972). The types of protected liberty interests are not unlimited. The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Plaintiff's claims is whether Defendants' actions impacted a constitutionally-protected interest. A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation. *Hewitt*, 459 U.S. at 466. A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process. *Gagnon v. Scarpelli,* 411 U.S. 778, 781 (1973). Interests recognized by the Supreme Court that fall within this category include the revocation of

parole, *Morrissey*, 408 U .S. at 471, and the revocation of probation, *Gagnon*, 411 U.S. at 778. The Due Process Clause, however, does not create an inherent liberty interest to remain free from restrictive conditions of confinement. *See, e.g., Hewitt*, 459 U.S. at 468; *Wolff*, 418 U.S. at 556. Nor does it create an inherent liberty interest guaranteeing housing in a particular penal institution or providing protection against transfer from one institution to another. *Meachum v. Fano*, 427 U.S. 215 (1976); *Montanye v. Haymes*, 427 U.S. 236 (1976). Accordingly, Plaintiff can succeed under the Due Process Clause only if the CMRC Program has created a constitutionally-protected liberty interest.

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court pronounced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by due process guarantees. Specifically, the Supreme Court held that prison conditions do not impact a protectable liberty interest unless they result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483 (emphasis added). Relevant factors to consider when determining whether conditions of confinement implicate a protected liberty interest include: 1) whether the conditions relate to and further a legitimate penological interest, such as safety or rehabilitation; 2) whether the conditions of placement are extreme; 3) whether the placement increases the duration of confinement; and 4) whether the placement is indeterminate. *Rezaq v. Nalley*, 677 F.3d 1001, 1012 (10th Cir. 2012). Further, "any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334, 1342 (10th Cir. 2007) (citation omitted).

In the case at bar, the CMRC Program relates to and furthers legitimate penological and societal interests. In addition, the conditions at the CMRC are not extreme. Third, placement in the

CMRC does not increase the duration of an inmate's sentence. And fourth, placement in the CMRC is not indeterminate. Considering the facts alleged by Plaintiff, the Court finds that Plaintiff does not have a protected liberty interest in his placement in the CMRC. Thus, Plaintiff has failed to state a violation of his procedural Due Process rights.

The constitutional right to "substantive due process" protects individuals against arbitrary governmental action, regardless of the fairness of the procedures used to implement them. The Supreme Court has declined to set forth a precise rule outlining the contours of "arbitrary" conduct. Notwithstanding, in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the court instructed that the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that "shocks the conscience." In so holding, the court reiterated its long standing jurisprudence that only the most egregious official conduct can be said to be "arbitrary" in the constitutional sense. *Id*. at 848-850. The court further instructed that courts should employ a variable range of culpability standards, dependant upon on the circumstances of the case, in determining whether certain actions rise to a constitutionally "shocking" level. *Id*. *See also Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (the Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression).

Liberally construed and taken as true, Plaintiff does not state a violation of his substantive due process rights with respect to the CMRC Program.

**E. Religious Land Use and Institutionalized Persons Act**

As a final matter, Plaintiff asserts liability under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–1. RLUIPA provides that "no [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or

confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." § 2000cc–1(a)(1)–(2). The Act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). *See also Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir. 2006); *Hammons v. Saffle*, 348 F.3d 1250, 1258 (10th Cir. 2003); *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). The standards under RLUIPA are different than under the free exercise clause of the First Amendment.

To proceed with a claim under RLUIPA, a plaintiff "must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010).

Here, Mr. Moore has not made any showing that the CMRC Program imposed any burden, let alone a substantial burden, on the exercise of his religion. Moreover, the CMRC furthers a compelling governmental interest and does so by the least restrictive means as no religious doctrine of any kind is found anywhere in the Handbook. In fact, the CMRC has voluntary religious programs for the inmates to participate in. As Plaintiff fails to state a claim under RLUIPA, that claim will be dismissed as well.

**F. Conclusion**

The federal courts are not overseers of the day-to-day management of prisons. Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). Accordingly, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain

institutional security. *Beard v. Banks*, 548 U.S. 521 (2006); *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

Accepting the facts in the complaint as true, but not the conclusory statements, the Court concludes that Plaintiff has not alleged sufficient facts to state a plausible federal constitutional violation against any named Defendant. Nor has he alleged a violation under RLUIPA. Moreover, allowing Plaintiff to amend his complaint would be futile. Consequently, this action will be dismissed. Accordingly, it is

**ORDERED** that the Complaint and this action are **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B), 28 U.S.C. § 1915A and/or 42 U.S.C.A. § 1997e. It is

**FURTHER ORDERED** that leave to proceed *in forma pauperis* on appeal is denied. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438 (1962). If Plaintiff files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED at Denver, Colorado, this 17th day of April, 2015

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, Senior Judge
United States District Court